May it please the court, my name is Dee Dee Samet and I am representing Mr. Montez who is the Social Security Plaintiff requesting disability benefits. As opposed to the case before me, Mr. Montez is probably at the bottom of the food bank. We're not here to elect a man of the year, he was a murderer. He was in jail from the age of 21 to 35 for murder. But in spite of all of that, this man has a work history where if he wasn't in jail or hadn't had the industrial accident in 1997 where he was off work for quite a period of time, every other time he's worked. If you look at his earning records which is in the transcript you will see that, and it's in page 66, it shows that this man had a pretty good working history considering the only time he had out from work. Ms. Samet, I want to assure you that your client's background doesn't make any difference to me. He's paid his debt to society. The question I have for you is, I saw some indication in the treatment records that as a result of the pain that he suffered from the fall off the roof that he's been addicted to various narcotics, Percocet, heroin, methadone. Everything, everything. And the question I have for you is, I thought there was a regulation which may or may not be applicable to this case that basically prohibits the award of benefits to persons who are either addicted to drugs or alcohol. Am I misrecollecting? There is a regulation, but only if the main reason for their disability is the fact that they're addicted. The disability in this case has to do with this man's cervical problems, lumbar problems, depression, and the interesting fact in this case is this is a man that has had a lot of problems, but he has been clean for almost ten years. Well, almost, yeah. Except for two slips. Except for two slips. One in 2001, which was two years before the onset of disability. I knew I would get to it. Two years before the, oh, and I wanted to reserve a few minutes. Fine. Please. We'll help you out. And also he went to, did his methadone. He did everything that he could do. You have this person, which here has an X-ray, objective evidence, you know, of compression deformity of L4, severe multilevel focal arthropathy, moderate osteophytes, degenerative spurring in the right shoulder, sclerosis of the glenohumeral shoulder joint, and then you have, so you have a lot of objective signs of problems. Dr. Brailsford, who saw Mr. Montes, she showed that he had like 5% range of motion of the neck, 5% extension of the lumbar spine. This is an orthopedic doctor. Is the problem related to one side of his body? Because it looked to me like he actually was quite strong on the other side, and the ALJ, I think, made mention of that. He had some strength on the other side, but he also had neuropathy, which was both feet, and which he was unable sometimes even to wear shoes. I shouldn't have to ask this, because it's not your fault. What's neuropathy? Neuropathy is numbness in the feet due to diabetes, in this case. It comes from diabetes. And it causes burning pain in the feet, as he describes it. It's a numbness. And what you have here, too, is opposed to that, opposed to all of this evidence. The only evidence that the ALJ relied upon was the non-examining physicians, one of whom you can't even read the signature. I have no idea what he did, what his background is. And none of those non-examining physicians show that they reviewed all of the records, all of the information that was there, all of the X-rays. Even Dr. Rothbaum, who was an examining physician for the defendants, did not have all of the records to review that showed this. Counsel? Yes, ma'am. Yes, Your Honor. Can you clarify what types of daily activities your client engages in, and how the administrative law should have taken these into account, what he could and could not do? Well, for instance, one of the activities in which is recited by the federal judge in reviewing it, as well as by the district judge and as well as by the respondent's brief, shows that he was taking care of his house where his wife was working and his niece. As opposed to that, if you read the records carefully, what happened was he was helping and stayed at home, and his niece was helping to take care of the house. The other thing is they said that he was able to do various activities at home. He testified he did those with pain. He was having pain in doing those. They were very minor activities. Let me tell you one of the problems I have with this case. It deals with a case that I wrote in 2007. Excuse me for referring to it. It is the Hoopi case, which says, unless at step two of the analysis you claim severe disability, you cannot bring this into play in step five. And in this case, as I read the record, did you claim severe disability at step two? No. Well, this was a step five case. This was not a list case. I understand that. But did you at step two, according to the case Hoopi 499-3 at 1076, and I'm going to say it was not cited by either party, a vocational expert is required only when there are significant and sufficiently severe non-exertional limitations not accounted for in the grid, and these are raised at step two. Well, I thought that the vocational expert is required for two reasons. One is there are non-exertional limitations that would affect their ability to work, and two, if there are severe limitations, physical limitations, that would affect the ability to work. And the recent case that was just cited in the supplemental authorities indicated that the ALJ is supposed to, required to consider all limitations imposed by the claimant's impairments, even those that are not severe, and even those, though a non-severe impairment standing alone may not significantly limit an individual's ability to do basic work activities, it may when considered with limitations or restrictions due to other impairments. And that was the case that was cited recently in Carmichael v. Commissioner of Social Security, and it was in our supplemental authority. In this particular case, we not only have all of the limitations and the impairments and the information from Dr. Nestor, we also have the fact that their own doctor, Dr. Rao, gave extensive limitations with regard to a moderate, and granted it doesn't impact and mean that he can never do it, but there's a moderate difficulty in limited ability to carry out instructions, maintaining attention, concentration, performing activities within a schedule, and maintaining regular attendance. Well, when you combine that problem with his impairments, his inability to bend, his numbness in his legs and problems with walking, with the restrictions placed on him by Dr. Nestor, with the limitations shown by Dr. Brailsford and the limitations shown by the other doctors, then I think you have to have a vocational expert. But in my opinion, or I would submit that if there was disability found, I'd like to reserve the rest of my time. Thank you. Good morning to the members of the court. And with the court's indulgence, I'll take 15 seconds to tell the court that I would like to dedicate my argument to my grandmother, Bokwa Vandemar Lamar, who only graduated from high school but always told me all her life that she won the prize for elocution and poetry reading, and I know that she would be very proud to see me here this morning. I appreciate the opportunity to make that statement. Is this the first argument you've made to a court of appeal? No, Your Honor. I was counsel for the commissioner in Orne and in Hoopi, but I just felt the necessity to honor my grandmother in this manner. Have you done this before? No, Your Honor. Okay. Well, we're pleased to be the occasion for this honoring of your grandmother. Thank you for the indulgence. Okay. And just for the record, please state your name. My name is Sarah Ryan, and I represent the commissioner. Okay. Thank you. The basic situation here is that notwithstanding the damages that Mr. Montes, the claimant, suffered when he fell off the roof as a roofer in the mid-'90s, he nevertheless went back to work and continued working until the early 2000s when he picked up a watermelon and something snapped in his back, and at that time he went off work again. He took himself off work. Apparently he did not receive any sort of workers' compensation for the injury he suffered. He did not get a doctor's opinion saying that he was disabled from work, and he has not received a doctor's opinion that says that he is disabled from work. There is some controversy about whether the doctor, the treating doctor, Dr. Nestor's letters, which are offered by the claimant, do in fact say that he's disabled, and also some controversy about whether those letters were before the ALJ in the record. They are marked as exhibits before the appeals council, and it's the commissioner's contention that the ALJ did not have those letters before him when he wrote his decision, and therefore did not have the opportunity to respond to those letters and consider them. Could you assume, for the purposes of what I'm about to ask, that they were in front of the ALJ? Because there is some evidence that they were. I understand that there's some dispute about it, but could you assume for purposes of this question that they were? And if they were, can you still justify the decision of the ALJ? Yes, sir. Okay. The letters from Dr. Nestor were written apparently in April 2005 and July 2005, and the decision of the ALJ was May 2005. Dr. Nestor treated the claimant from October, or at least his treatment notes that are in the record are from August of 2005 until October 2000. Excuse me, August through October 2004. According to the ALJ's notations about those treatment notes. I think you were telling me that he probably was not his physician for very long. I'm looking at the to whom it may concern letter from Dr. Nestor. I have been Mr. Montez's treating physician for a number of years, he says. That's what he says, but the only treatment notes we have in the record are from August 2004 until October 2004. Right. So that's all the ALJ had to go on. Well, but I'm asking you for purposes of my question to assume that this was in front of the IJ. I understand that, sir. What I'm trying to say, though, is that the ALJ had only those treatment notes to support Dr. Nestor's letters. Yeah, although, you know, we're quite accustomed to and it's quite legitimate for ALJs to discount in various ways and sometimes for very good reasons what doctors say, but it's typically because, you know, the doctor's treating this person has become quite sympathetic to the patient, maybe exaggerates the degree of disability for purposes and so on. But for a doctor to say number of years when the truth is number of months, I would be astounded if the ALJ would conclude that the doctor was lying about number of years. The ALJ did not make that statement, Your Honor. I understand, but I'm a little nervous if you're saying to me that if the ALJ had this letter in front of him but only treatment notes for a period of less than a year, that the ALJ would have concluded that the actual treatment took place only over a period of less than a year. All the ALJ said in his decision was that Dr. Nestor noted an improvement in the degree of numbness of his feet from the neuropathy once he adjusted his diabetic medicine. And that's why it's very difficult to make the assumption that the ALJ actually had the letters in front of him. Now, if we look at the letters themselves, they were inconclusive, because the doctor simply says he should avoid stooping, climbing, bending, et cetera. He does not make any actual limitations. He says that they are not written in terms of functional limitations such as an RFC normally is written. So those letters are not absolute preclusions against those activities. Okay. I think you're accurate in describing, for example, at the end of the one that has the date stamp, April 29, patients should not lift, bend, stoop, or climb, probably could not maintain a consistent schedule, but that's a should not rather than cannot. Correct. That's your point. Yes, sir. Yes, sir. And as against that, we have the examination of the neurologist, Dr. Lawal, who says that he can walk two hours a day. Now, bear in mind that the ALJ assessed a sedentary RFC, which would require walking no more than two hours a day. And we have the assessment of the non-examining state agency reviewing physician, who says that he can do a sedentary RFC, bearing in mind the different medical records. Then also there are doctors Brailford and Cooley, who are orthopedic treating physicians, who are urging Mr. Montes to get active, to go into physical therapy and to get up and get active. They're saying that's what's going to make him feel better. And taking all of that in mind, the ALJ assesses a sedentary RFC. Now, with a sedentary RFC under SSR 96-9P, the preclusion against occasionally stooping, bending, lifting, climbing, et cetera, that the ALJ assesses would not be a significant non-exertional limitation so as to require the necessity of a vocational expert at Step 5 implicating whoop-by, so that there is no need for the ALJ properly relied on the medical vocational guidelines at Step 5 rather than calling a bee. The magistrate judge wrote an extraordinarily careful and thorough report and recommendation, something almost 35 pages long. Why is the magistrate judge wrong? In my opinion, the magistrate judge substituted his opinion for that of the ALJ and invaded the province of the commissioner to weigh the evidence. And that is why we filed objections to the R&R. Okay. Further questions from the bench? No, thank you. Okay. Let me just say that I think your grandmother would be very proud. Thank you very much, Your Honor. I agree. I appreciate the opportunity. All right. Thank you. And I think your grandmother would be too. I was just going to say the same thing. I think my mother would have been. She's the one that made me be a lawyer. Okay. I always would get, when I would get upset with her, I said, the only reason that I'm unhappy is because you made me be a lawyer. If I had been a buyer at a department store, I'd be happy.  Thank you. I think that counsel misspoke just a little. It was 2003 that Mr. Montes worked through, not 2000, that he worked up until 2003 when he went off work for disability. That was when he had the produce accident, 2003. Yes, Your Honor. And the appeals counsel, the evidence, and my mistake, I submit what I think is persuasive evidence, along with my request for review, to the appeals counsel. They did have, the one letter was in front of the judge, the magistrate, excuse me, not the magistrate, but the administrative law judge, the one in April from Dr. Nestor. The second letter was submitted to the appeals counsel, along with the records from a letter from Kodak, which basically said that this man was not noncompliant, that he really did as much as he could do. I mean, we have a marginal person here. So the second letter that was not submitted to the ALJ, that accounts for the first sentence, which says, I was told there's a question of the motivation, da, da, da. That is to say, I'm now informed of what the ALJ decided. That's the reference. Okay. Yes, Your Honor. Yes, Your Honor. But the first letter was, and should not, to me, could not, and should not are really a matter of semantics. The doctor said he shouldn't do that. And more importantly, Dr. Nestor said he could not do sustained work. That alone shows that in order to find out whether a vocational rehab, vocational expert should talk about, is this person able to do sustained work? If he can't and he's not going to be able to do it, can you find a job for him? Is there such a job on the national labor economy? There were a lot of errors in this case, and another one was the clear and convincing standard. The judge, there was no clear and convincing evidence to show they shouldn't have rejected the subjective testimony of the claimant. Is there any further questions? Thank you, Your Honor. Thank you very much. Thank you both for good arguments in this case. Montez v. Astrie is now submitted for decision. That concludes the argument calendar, both for this morning and for this week, and we are now in adjournment. I think the old phrase is sine diem.
judges: Nelson, Fletcher, Tallman